Michael J. Frevola
Christopher R. Nolan
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, New York 10007-3189
Tel.:   (212) 513-3200
Fax:   (212) 385-9010
E-mail: michael.frevola@hklaw.com
         chris.nolan@hklaw.com
         lissa.schaupp@hklaw.com

Attorneys for Plaintiff,
*Prosperity Cement (Asia) Limited – Macao Commercial Offshore*



**'09 CIV 7311**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PROSPERITY CEMENT (ASIA) LIMITED –
MACAO COMMERCIAL OFFSHORE,

                              Plaintiff,

          - against -

CEMENTVAL S.L.,

                              Defendant.

09 CV _____ (___)

**VERIFIED**
**COMPLAINT**

Plaintiff, Prosperity Cement (Asia) Limited – Macao Commercial Offshore ("Prosperity"), by and through its attorneys, Holland & Knight LLP, for its verified complaint against Cementval S.L. ("Cementval"), alleges as follows:

1.     This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.      At all times material herein, plaintiff Prosperity was and is a business entity organized and existing under the laws of a foreign country with its principal place of business at Rm. A4, 2/F., AV. Praia Grande, No. 369, Keng Ou Commercial Building, Macao.

3.      At all times material herein, defendant Cementval was and is a business entity organized and existing under the laws of a foreign country with its principal place of business at Moratin 17-4, 46002 Valencia, Spain.

### FIRST CAUSE OF ACTION

4.      On or about January 19, 2008, Prosperity, as seller, and Cementval, as buyer, entered into a contract for four (4) shipments of 80,000 metric tons each (10% more or less at seller's [Prosperity's] option) of Ordinary Portland Cement Clinker or Sulfate Resistant Clinker[1] from two load ports in China to the discharge port of Valencia, Spain (the "Contract"). A true and correct copy of the Contract is annexed as Exhibit 1.

5.      Article 2 of the Contract states that the clinker shall be produced at "any Conch Cement Plant in China."

6.      Article 17 of the Contract provides that the International Rules of the Interpretation of Trade Terms known as Incoterms 2000 and as amended, shall apply to this Contract.

7.      Article 5 of the Contract entitled "Price" sets forth the price for the clinker in U.S. currency and also sets forth the shipping terms for the carriage of the cargo. Specifically, Article 5 states that the price for the shipments of Ordinary Portland Cement Clinker is "CNFFO Valencia, Spain USD83.50 per metric ton." CNFFO is a trade term meaning costs plus freight free on board. Under the Incoterms, when goods are shipped "Cost and Freight" the seller must

---

[1]    Clinker is solid material that is ground (usually with the addition of a little gypsum) to make Portland cement.

pay the costs and freight necessary to bring the goods to the named port of destination, but the risk of loss of or damage to the goods, as well as any additional costs due to events occurring after the time of delivery, are transferred from the seller to the buyer. Additionally, the term "free on board" places the obligation and responsibility of loading the vessel on the seller, here Prosperity. This is consistent with Articles 12 and 14 of the Contract pertaining to Title and Risk and Loss of Cargo.

8.    Article 6 of the Contract provides that lighterage, stevedores, wharfage and other expenses in connection with the discharging of the cargo at the discharge port are to be borne by the buyer, Cementval.

9.    Article 9 of the Contract sets forth the contractually-mandated discharge rates at the discharge port and the terms for the commencement of laytime.

10.    Article 10 of the Contract pertains to demurrage stating the upon nomination of the vessel to perform the Contract, the Seller [Prosperity] must declare the demurrage rate for the Buyer's [Cementval's] approval.

11.    Article 11 of the Contract provides for the following shipping schedule and laycans for the performing vessel to be nominated by Prosperity:

- 1st shipment January/February 2008
- 2nd shipment April/May 2008
- 3rd shipment July/August 2008
- 4th shipment October/November 2008

12.    Article 11 also sets forth, *inter alia,* the following specifications for the performing vessel: geared or gearless in Seller's [Prosperity's] option, Panamax type, maximum 27 years old, no twin hatches, fully P&I covered and classed by an IACS [International Association of Classification Societies Ltd.] member. Pursuant to Article 11, Prosperity was to

nominate the performing vessel that complies with the contractual specifications, and provide Cementval with, *inter alia,* the vessel details, realistic ETA at loading port, and copies of the vessel's documentation.

13.     Three shipments of clinker were shipped by vessel under the Contract, but despite repeated demands by Prosperity, and in breach of the Contract, Cementval refused to accept the fourth shipment.

14.     As discussed above in paragraph 5, the four (4) shipments of clinker that Prosperity agreed to provide to Cementval were to be produced by any Conch Cement Plant in China.  Accordingly, Prosperity negotiated with third-party Shanghai Conch Building Materials International Trade Co., Ltd. ("Conch Building") for Conch Building to supply to Prosperity the clinker due under the Contract and to find vessels to carry the clinker to Valencia in accordance with the terms of the Contract.  Conch Building turned to Shanghai Conch Logistics Co., Ltd. ("Conch Logistics") for chartering in vessels for carriage of the clinker to Valencia.

15.     Conch Logistics in turn entered into a charter party with China National Chartering Co., Ltd. (formerly China National Chartering Corp.) ("Sinochart") under which vessels would be provided to Conch Logistics for carriage of the clinker to Valencia and so that Conch Logistics could charter out such vessels to Conch Building for the carriage of the clinker ("Sinochart Charter").

16.     Conch Logistics subsequently entered into a charter party with Conch Building ("Conch Logistics Charter"), the terms of which were back-to-back with the Sinochart Charter.

17.     As a result of Cementval's failure to accept the 4th shipment under the Contract, Sinochart suffered damages in unpaid freight with respect to the non-performance of the carriage of the 4th shipment chartered to Conch Logistics under the Sinochart Charter.  Sinochart

demanded that Conch Logistics pay these damages. Conch Logistics passed Sinochart's demand as an indemnity claim to Conch Building and Conch Building under the Conch Logistics Charter passed Sinochart's demand on to Prosperity, once again on the principle of indemnity for the unpaid freight under the Sinochart Charter.[2]

18.    On or about April 7, 2009, Prosperity agreed to pay Conch Building, Conch Logistics, and Sinochart (collectively, the "Contracting Parties") based on the unpaid freight indemnity claims against Prosperity in the amount of US$2,160,000.00 (the "Indemnity Payment"). A true and correct copy of Prosperity's agreement to pay the Indemnity Payment is annexed hereto as Exhibit 2. Prosperity is entitled to indemnification from Cementval for the Indemnity Payment already paid by Prosperity to the Contracting Parties for unpaid freight, for which Prosperity would not have been otherwise liable except for Prosperity's breach of the Contract.

19.    Despite Prosperity's due demands for payment, Cementval has failed to remit payment of the US$2,160,000.00 for the unpaid freight that Prosperity paid to the Contracting Parties that resulted from Cementval's breach of the Contract.[3]

## PROSPERITY'S TOTAL CLAIM

20.    As a result of Cementval's breach of the Contract, Prosperity is due a total of US$2,160,000.00 based that Prosperity paid for unpaid freight.

21.    Article 18 of the Contract provides for London Arbitration with the application of English law.

---

[2]    It is well-settled that an indemnity claim seeking to pass liability for a maritime claim likewise is a maritime claim subject to admiralty jurisdiction. *See, e.g., N. Shipping Co. v. Ocean Eleven Shipping Co.,* 09 Civ. 4154 (DC), 2009 U.S. Dist. LEXIS 52584, at *4 (S.D.N.Y. Jun. 16, 2009) (citing *Norfolk S. Ry. Co. v. Kirby,* 543 U.S. 14, 24 (2004)).

[3]    Prosperity also has claimed other damages in London arbitration based on the Contract that arguably are not maritime claims and, therefore, Prosperity has not sought an attachment order for those claims herein.

22.    In London arbitration where English law applies, costs, including a reasonable allowance for attorneys' fees, arbitrators' fees, disbursements, and interest are recoverable as part of plaintiff's claim pursuant to Section 63 of the English Arbitration Act of 1996.

23.    It is estimated that it will take approximately three (3) years to resolve this matter. Under relevant English law, interest is to be computed on the basis of the Prime Rate (currently 3.25%), resulting in the following estimated interest and attorneys' fees in addition to Prosperity's principal claim:

| | |
|---|---|
| Interest (3.25% on $2,160,000 for three years) | $  210,600 |
| Attorneys' fees and costs: | $  250,000 |
| Principal Claim: | $2,160,000 |
| Total Sought: | **$2,620,600** |

## REQUEST FOR ATTACHMENT

24.    While all disputes arising out of the Contract are to be arbitrated in London, the action herein which is submitted in accordance with Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure as well as 9 U.S.C. §8, is not and cannot be considered a waiver of the Contract's arbitration clause.

25.    The Contract provides for payment of the clinker in U.S. Dollars.  It is common practice in the maritime industry to require that payments be made in U.S. Dollars and payments are made in U.S. Dollars in conformance with these requirements.

26.    International electronic fund transfers in U.S. Dollars between two non-U.S. entities pass through intermediary banks in New York.

27.    Cementval S.L. is not found within the Southern District of New York but does transact business in U.S. Dollars as evidenced by the Contract at issue here.  Hence, Cementval does have, or will have during the pendency of this proceeding, assets, goods, chattels, credits, letters of credit, bills of lading, debts, effects and monies, funds, credits, wire transfers, accounts, letters of credit, electronic fund transfers, freights, sub-freights, charter hire, sub-charter hire, or other tangible or intangible property which belongs to it, are claimed by it, are being held for it or on its behalf, or which are being transferred for its benefit, within the jurisdiction at the following financial institutions:   ABN Amro Bank; American Express Bank; Banco Popular; Bank of America, N.A.; Bank of China; Bank Leumi USA; The Bank of New York Mellon; Bank of Tokyo-Mitsubishi UFJ Ltd.; BNP Paribas; Calyon Investment Bank; Citibank, N.A.; Commerzbank; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; Standard Chartered Bank; Société Générale; UBS AG; Wachovia Bank, N.A.; or any other financial institution within the Southern District of New York.

**WHEREFORE**, plaintiff Prosperity Cement (Asia) Limited -- Macao Commercial Offshore prays:

1.    That a summons with process of attachment and garnishment may issue against the defendant Cementval in the amount of US$2,620,600 (including estimated interest, attorneys' fees and costs), and if defendant Cementval S.L. cannot be found, then that its goods, chattels, credits, letters of credit, bills of lading, debts, effects and monies, funds, credits, wire transfers, accounts, letters of credit, electronic fund transfers, freights, sub-freights, charter hire, sub-charter hire, or other tangible or intangible property which belongs to it, are claimed by it, is being held for it or on its behalf, or which are being transferred for its benefit, within the district may be attached in an amount sufficient to answer Prosperity's claim;

2.  That defendant Cementval S.L., and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

3.  That this court recognize and confirm any judgment(s) rendered on the claims set forth herein as a Judgment of this Court;

4.  That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof; and

5.  That judgment be entered in favor of Prosperity Cement (Asia) Limited – Macao Commercial Offshore and against Cementval S.L. in the amount of US$2,620,600 (including estimated interest, attorneys' fees and costs); and,

6.  That this Court grant Prosperity Cement (Asia) Limited – Macao Commercial Offshore such other and further relief which it may deem just and proper.

Dated: New York, New York
       August 19, 2009

HOLLAND & KNIGHT LLP

By: _____
    Michael J. Frevola
    Christopher R. Nolan
    Lissa D. Schaupp
    HOLLAND & KNIGHT LLP
    195 Broadway
    New York, New York 10007-3189
    Tel.:  (212) 513-3200
    Fax:   (212) 385-9010
    E-mail:  michael.frevola@hklaw.com
             chris.nolan@hklaw.com
             lissa.schaupp@hklaw.com

    Attorneys for Plaintiff
    *Prosperity Cement (Asia) Limited – Macao*
    *Commercial Offshore*

## VERIFICATION

STATE OF NEW YORK            )

                                    :ss.:

COUNTY OF NEW YORK        )

      Michael J. Frevola, being duly sworn, deposes and says:

      I am a member of the firm of Holland & Knight LLP, counsel for Prosperity Cement (Asia) Limited – Macao Commercial Offshore ("Plaintiff"), plaintiff in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Plaintiff's representative and corresponded with Plaintiff's representatives regarding this matter. I am authorized by Plaintiff to make this verification, and the reason for my making it as opposed to an officer or director of Plaintiff is that there are none within the jurisdiction of this Honorable Court.

                                                    _____

                                                      Michael J. Frevola

Sworn to before me this
19th day of August, 2009

_____
Notary Public

Elvin Ramos
Notary Public, State of New York
NO. 01RA4870243
Qualified in Queens County
Certificate filed in New York County
Commission Expires September 2, 2010

# 8770701_v1

9

# EXHIBIT 1

# CONTRACT FOR THE SUPPLY OF CLINKER

Between

**Prosperity Cement (Asia) Limited - Macao Commercial Offshore**
**Rm A4, 2/F., AV. Praia Grande, No 369,**
**Keng Ou Commercial Building,**
**Macau.**
(hereinafter called "SELLER")

and

**Cementval S.L.**
**Moratin 17-4**
**46002 Valencia**
**SPAIN**
(hereinafter called "BUYER")

Contract Date: 19 January 2008
Contract No. PCALMCO/CSL/001

WHEREAS BUYERS agree to buy and SELLERS agree to sell the goods herein mentioned all on such terms and conditions as set out hereunder:

1.  **Product**
    Ordinary Portland Cement Clinker
    In bulk suitable to produce Ordinary Portland Cement Type I conforming to ASTM C150.

    Or

    Sulfate Resistant Clinker
    In bulk suitable to produce ASTM Type V cement

    Clinker specifications as per attached.

2.  **Origin**
    The clinker shall be produced by any Conch Cement Plant in China.

3.  **Destination**
    One safe berth, one safe port of Valencia, Spain where Buyer's to guarantee 14.00M draft at discharge port. However, owners to satisfy themselves all other port restrictions at discharge port.

4.  **Quantity**
    4 (Four) Shipments each 80,000MT Ordinary Portland Cement Clinker 10% more or less in Seller's option.  ( 20,000 ~ 4個月)

5.  **Price**
    Ordinary Portland Cement Clinker
    CNFFO Valencia, Spain USD83.50 per metric ton.

    Sulfate Resistant Clinker
    CNFFO Valencia, Spain USD88.00 per metric ton.

1



6.    **Terms of Payment**
By a confirmed and irrevocable Letter of Credit, payable at sight against presentation of the Documents mentioned on clause (7).

7.    **Documents**
The Seller shall present the following documents to the Buyer upon receipt the invoice amount:
<u>1st Loading Port Nantong/Zhenjiang/Zhangjiagang</u>
- A full set of Marine Clean On Board Bills of Ladings marked "Freight Payable as Per Charter Party" signed by master or the appointed agent for or on behalf of the master of the vessel.
- Commercial Invoice in triplicate
- Packing List in triplicate
- Certificate of Origin (Form A) issued by Shanghai Entry-Exit Inspection and Quarantine Bureau, The People's Republic of China or an independent surveyor
- Certificate of Quality issued by beneficiary
- Draft survey report issued by an independent surveyor
- Inspection Certificate of Cleanliness of Holds or Hold Clean Inspection Report issued by an independent surveyor.

<u>2nd Loading Port Zhoushan/Lianyungang</u>
- A full set of Marine Clean On Board Bills of Ladings marked "Freight Payable as Per Charter Party" signed by Master or the appointed agent for or on behalf of the master of the vessel.
- Commercial Invoice in triplicate
- Packing List in triplicate
- Certificate of Origin (Form A) issued by Shanghai Entry-Exit Inspection and Quarantine Bureau, The People's Republic of China or an independent surveyor
- Certificate of Quality issued by beneficiary
- Draft survey report issued by an independent surveyor

8.    **Other Expense at Discharging Port**
Lighterage, stevedorage, wharfage and other expenses in connection with the discharging of this cargo at discharging port to be borne by the Buyer.

However, all damages, if any, caused by stevedores at discharge port to be settled directly between Master/Stevedores.

At discharging port the cost of shifting to be for account of the party ordering the same.

If ordered by port authorities cost to be for Buyers account.

9.    **Discharging rate**
Daily discharging rate 20,000MT PWWD of 24 consecutive hours SHINC except superholidays, eg January 1st, January 6th, Easter Friday (21st March 2008), Easter Sunday (23rd March 2008), July 16th , October 12th and December 25th.  Laytime at discharge port shall commence 12 hours after the Notice of Readiness (N/R) is tendered unless sooner commences

Notice of Readiness can be tendered any time day or night Sundays and holidays included and shall be tendered only after the vessel has arrived at the pilot area/anchorage of the Port of Discharging. If the vessel is not in free pratique on its arrival due to causes attributable to the vessel, then the new notice of readiness must be re-tendered after free pratique is granted.

NOR may be tendered by TLX/CABLE/FAX/VHF/IN WRITING in master's option

2




Laytime shall ceased to count upon completion of discharge. The lay time allowed to be calculated based on B/L quantity

All other terms and conditions shall be as per Gencon 1994.

Buyer to use original bills of lading or bank guarantee to discharge the cargo.

**10.    Demurrage and Despatch Money**
Upon nomination of vessel, Seller must declare the demurrage rate for Buyer's approval.

The despatch for laytime saved which will be based on half the demurrage rate.

Demurrage and despatch money to be settled within 20 (twenty) days after completion of loading and mutually agreed as correct according to Notice of Readiness, Time Sheet and Statement of Fact duly signed by shipmaster and vessel agent. Documentation and submission acceptable even by fax.

**11.    Shipping Schedule, Laycan and Performing Vessel**

The following shipping schedule to be used as a guidance only without commitment from Buyer, however Buyer will declare a laycan of each shipment at least 30 days prior to the commencement of the laycan

- 1st shipment January/February 2008
- 2nd shipment April/May 2008
- 3rd shipment July/August 2008
- 4th shipment October/November 2008

A 15 days spread laycan and Seller to narrow down to 7 days spread laycan 14 days before the first layday, with vessel's particulars for Buyer's approval and expected loadable quantity

Performing vessel to be: STDBC, geared or gearless in Seller's option, Panamax type, maximum 27 years old, no twin hatches, fully P&I covered and classed by an IACS member.

If vessel age more than 27 years overage premium (OAP) to be for owner account.

Upon nomination of the performing tonnage Seller to provide:

- Vessel's full T/C description include LOA/BEAM/DFT/HO-HA DIMS/CLASS/P&I CLUB/ Distance from water line to the top of hatch coaming/air draft (water line to top)/ETA first loading port

- The expected loadable quantity at both loading ports.

- Copies of classification certificate SMC (Safety Management Certificate), DOC (Document of Compliance), ISSC (International Ship Security Certificate).

- Vessel's present position/itinerary/last cargo-port/agents last port/realistic ETA loadport

Upon Buyer's request, at least one hold would be fully loaded at 1st loading port of SR Clinker if required.

Seller's nomination of the performing vessel is subject to Buyers/Receivers approval, declarable 18 working hours after Seller's nomination which will not be unreasonably withheld

3

Seller confirm:

- Vessel is standard bulk-carrier, steelfloored, no obstructions/pillars/tunnels/container lashingpoints and/or shoes situated within holds.

- Vessel is and shall remain fully classed and P&I covered/insured during currency of the Charter Party.

- Vessel classed by a member of the IACS and without any outstanding class recommendations that may effect execution of this voyage.

- BIMCO'S ISPS and ISM clauses for voyage charter to apply.

Upon Buyer's confirmation of the nominated by the Seller ship, Master/Seller of the performing vessel to provide following notices:

Loading Port:
5/3/2/1 Days to Buyer

Discharging Port:
Sailing loading port and then on daily basis to Buyer and discharging port agents.

**12.    Title And Risk**

12.1    The clinker shall be deemed to have been delivered to the Buyer as and when the clinker has been delivered on board the vessel spout-trimmed at loading port

12.2    Title with respect to the clinker delivered shall pass from Seller to Buyer when Seller has received the proceeds from the negotiation bank against the relative shipping documents as set forth in Clause 7 and after completion of delivery on board the vessel at loading port with restropective to the time of delivery of the clinker

12.3    Risk with respect to the clinker delivered shall pass from the Seller to the Buyer in delivery of the clinker in accordance with Clause 12.1 above.

**13.    Inspection**

13.1    Quality:
Test certificate issued by the manufacturer at the time of shipment at loading port shall be final.

13.2    Quantity:
Draft survey report issued by Entry-Exit Inspection and Quarantine of the People's Republic of China (CIQ) at Seller's account at the port of loading at the time of shipment shall be final.

**14.    Loss of Cargo**
In the event of loss of cargo or any part of it after it has passed the ship's rail at loading port Buyer undertakes to pay Seller on the basis of Bills of Lading weight.

**15.    Marine Insurance**
Marine Insurance to be covered by Buyer from the time clinker is loaded on board the vessel at loading port.

**16.    Force Majeure**

4





Neither party shall be responsible for any loss to the other party whereby they are unable to fulfil in whole or in part any of the terms and conditions herein contained or prevented or delayed from fulfilling any part of this contract for any reason due to Force Majeure which shall include civil disturbances, floods, strikes, fire, government regulations including government export restrictions, war or hostilities (whether war declared or not), acts of foreign enemy, rebelion, riots, earthquakes and Acts of God. A certificate issued by The Trade Department of The Chamber of Commerce of each country shall be sufficient proof of the existence and duration of such circumstances.

17. **Interpretation**
The International Rules of the Interpretation of Trade Terms known as Incoterms 2000 and as amended, shall apply to this Contract.

18. **Governing Law & Arbitration**
The English Law shall govern the validity, interpretation and performance of this Contract.

Both parties will make every effort to settle any dispute in an amicable way in connection with the interpretation or execution of this Agreement.

If in spite of the above, the parties do not reach an agreement then all disputes arising out of or in connection with the present Contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one arbitrator appointed in accordance with the said Rules.

The arbitration shall be held in London and shall be in the English language, in accordance to the laws of England. The Arbitration award shall be final and binding for both parties and can be executed also under English law and practice.

19. **Entire Agreement**
This Contract constitutes and contains the entire and only agreement between the parties hereto with respect to the subject matter hereof and supersedes and mutually cancels any and all pre-existing agreements and understandings between the parties relating to the subject matter hereof, whether oral or written, and proposed additional or different terms contained in the Seller's and Buyer's communications and not specifically accepted in writing by the other party hereto are hereby objected to without further notice. No representation, inducement, promise, understanding, condition or warrant not set forth herein has been made or relied on by other party.

20. **Government Restriction**
If due to some unforeseen circumstances, the local authority were to impose any export restrictions on cement export eg export tariff or export ban, Buyer and Seller shall renegotiate the terms of the contract.

21. **Others**
This contract between Seller and Buyer cannot be transferred to any third party without the written consent of Seller and Buyer.

Two original contracts will be made, unchanged, signed and kept each by the Buyer and the Seller.

**THE BUYER**

**THE SELLER**

*For and on behalf of*
吾其水泥有限公司 – 澳門離島商業服務
PROSPERITY CEMENT (ASIA) LIMITED – MACAO
COMMERCIAL OFFSHORE

......................................
*Authorized Signature(s)*

5

The Specification of Conch Brand Portland Cement Clinker

| Item | | Specification |
|------|------|------|
| SIO2 | | $21.00 \sim 23.00\%$ |
| CAO | | $\geq 64.00\%$ |
| MGO | | $\leq 4.00\%$ |
| SO3 | | $\leq 1.00\%$ |
| LOSS OF IGNITION | | $\leq 1.50\%$ |
| INSOLUBLE RESIDUE | | $\leq 0.75\%$ |
| F-CAO | | $\leq 1.50\%$ |
| C3S | | $50.00 \sim 60.00\%$ |
| C2S | | $16.00 \sim 26.00\%$ |
| SETTING TIME | INITIAL | $\geq 60$ min |
| | FINAL | $\leq 300$ min |
| COMPRESSIVE STRENGTH | 3 DAYS | $\geq 28$ MPa |
| | 28 DAYS | $\geq 55$ MPa |

Remark:   The above specification conforms to China National Standard and suitable to produce
Ordinary Portland Cement conforming to ASTM C150




6

The Specification of Conch Brand Sulfate Resistant Clinker

| Item | | Standard |
|---|---|---|
| SiO2 | | ≥20.0% |
| Al2O3 | | ≤6.0% |
| Fe2O3 | | ≤6.0% |
| MgO | | ≤4.0% |
| SO3 | | ≤1.0% |
| Loss of Ignition | | ≤1.0% |
| f-CaO | | ≤2.0% |
| Insoluble residue | | ≤0.5% |
| Na2O Eq | | ≤0.6% |
| C3S | | ≥54%, ≤75% |
| C3A | | ≥1%, ≤4.5% |
| C4AF+2 C3A | | ≤25% |
| Autoclave Expansion | | ≤0.8% |
| Setting Time | Initial | ≥45min |
| | Final | ≤300min |
| Compressive strength | 1 day | ≥10MPa (1450psi) |
| | 3 days | ≥20MPa (3190 psi) |
| | 7 days | ≥27MPa (3920 psi) |
| | 28 days | ≥38MPa (5800 psi) |

Remark: The above-mentioned Clinker suitable to produce ASTM Type V cement.

7




# EXHIBIT 2

THIS DEED OF SETTLEMENT is made on 7th day of April 2009

BETWEEN

(1)    PROSPERITY CEMENT (ASIA) LIMITED – MACAO COMMERCIAL OFFSHORE(昌兴水泥有限公司-澳门离岸商业服务), a company incorporated in Macao whose registered address is at Rm A4, 2/F., AV. Praia Grande, No 369. Keng Ou Commercial Building, Macau ("PCAL");

(2)    SHANGHAI CONCH BUILDING MATERIALS INTERNATIONAL TRADE CO., LTD (上海海螺建材国际贸易有限公司), a company incorporated in the People's Republic of China whose registered address is at 11/F., Yu'an Mansion, 738 Dongfang Road, Pudong, Shanghai China ("Conch Building");

(3)    SHANGHAI CONCH LOGISTICS CO., LTD (上海海螺物流有限公司), a company incorporated in the People's Republic of China whose registered address is at 11/F., Yu'an Mansion, 738 Dongfang Road, Pudong, Shanghai China ("Conch Logistics"); and

(4)    CHINA NATIONAL CHARTERING CO., LTD (formerly China National Chartering Corp.) (中國租船公司), a company incorporated in the People's Republic of China whose registered address is at Room 818, Sinotrans Plaza A, A43 Xizhimen Beidajie, Beijing 100044 China ("Sinochart");

(collectively referred to as the "the Contracting Parties")

WHEREAS:-



A. In or about November 2007 PCAL started to negotiate with Cementval S.L., a company incorporated in Spain ("Cementval") about the sale and purchase of Cement Clinker, and in about December 2007 an initial agreement was reached whereby PCAL agreed to sell and Cementval agreed to buy 4 (Four) shipments each 80,000 MT ordinary Portland Cement Clinker 10% more or less in Seller's option and which should be produced by any Conch Cement Plant in China and which are to be delivered in 4 (Four) shipments spread evenly in 2008 and be carried by vessels from China to and delivered at Valencia, Spain ("the Goods").

B. In light of the matters set out in A, PCAL negotiated with Conch Building for the sale and supply to PCAL by Conch Building the Goods. Conch Building was to also find vessels to carry the Goods to Valencia.

C. In light of the matters set out in B, Conch Building resorted to Conch Logistics for chartering in vessels and/or to find vessels for carriage of the Goods to Valencia.

D. In light of the matters set out in C, Conch Logistics entered into a charterparty with Sinochart on 17th December 2007 ("the Sinochart Charterparty") under which vessels would be provided by Sinochart to Conch Logistics for carriage of the Goods to Valencia, and so that Conch Logistics could charter out such vessels to Conch Building for carriage of the Goods.

E. Conch Logistics subsequently entered into a charterparty with Conch Building which charterparty is back to back of the Sinochart Charterparty ("the Conch Logistics Charterparty") for the carriage of the Goods.

2.08.4441.00 842299

2



F.  Pursuant to an agreement dated 5 January 2008 as supplemented by an
agreement dated 30 January 2008 and further supplemented by an agreement
dated 24 April 2008 entered into between Conch Building and PCAL (the
"Supply Agreement"), Conch Building agreed to sell, supply and carry the
Goods and PCAL agreed to purchase the Goods.

G.  Pursuant to an agreement dated 19 January 2008 entered into between PCAL
and Cementval (the "Sale Agreement"), PCAL agreed to sell, supply and carry
the Goods, and Cementval agreed to purchase and take the Goods.

H.  Three shipments of the Goods had taken place in 2008 under the Supply
Agreement and correspondingly under the Sale Agreement.  Despite repeated
demands by PCAL, in breach of the Sale Agreement Cementval have been
refusing to take the 4th shipment of the Goods in 2008 and continue to refuse to
take the 4th shipment to date.

I.  Sinochart asked Conch Logistics to pay damages for losses they suffered in
respect of the non performance of the carriage of the 4th Shipment chartered to
Conch Logistics. Conch Logistics passed Sinochart's demand to Conch Building,
and Conch Building passed and resorted to PCAL Sinochart's demand for
payment of damages.

J.  Sinochart alleged that by reasons of the breach of the Sinochart Chartparty by
Conch Logistics, they have suffered losses and damages in the sum of
US2,405,384.10 ("Sinochart's Losses") and they asked Conch Logistics to pay
the same sum otherwise they would take all legal actions available to them
against Conch Logistics. Conch Logistics asked Conch Building and Conch

2.03.4441.00.842299                           3

Building asked PCAL to pay the Sinochart's losses otherwise they would seek a full indemnity against PCAL by legal actions. Considering the long-term good relationship between the parties and subject to safe receipt of the sum by Sinochart within 3 banking days from the date of this Deed, following rounds of negotiations Sinochart had agreed to reduce the amount of their claim for the Sinochart's Losses to US$2,160,000.00.

K.  For the purposes of avoiding any potential litigations and mitigating losses , the Contracting Parties had agreed to settle all their disputes and differences under the charterparties and Supply Agreement  including Sinochart's Losses amicably on the terms hereinafter appearing.

**AND NOW THIS DEED WITNESSETH as follows:-**

1.  On a without admission of liability basis PCAL shall pay Sinochart the sum of US$2,160,000.00 (United States Dollars Two Million One Hundred and Sixty Thousand) (the "Settlement Sum") within 3 banking days from the date of this Deed. The Settlement Sum shall be paid by way of telegraphic transfer into the following bank account:

    BANK OF COMMUNICATIONS, BEIJING BRANCH
    CHIPS UID NO.: 332906
    SWIFT CODE: COMMCNSHBJG
    JPMORGAN CHASE BANK
    270 PARK AVE. NEW YORK, NY10017 U.S.A
    ACCOUNT NO.: 110060774145340013623
    ULTIMATE BENEFICIARY: CHINA NATIONAL CHARTERING CO., LTD.

2.  Subject to safe receipt of the Settlement Sum by Sinochart within 3 banking days from the date of this Deed, PCAL's payment of the sum shall be in full and final settlement of all claims which Conch Logistics, Conch Building, and/or Sinochart

2.08.4441.00 847289                        4

have or may have against PCAL, and/or all duties, obligations or liabilities which the Contracting Parties owe or may owe to each other in respect of the Sinochart's Losses, Conch Logistics' losses (if any) and/or Conch Building's losses ( if any) arising out of or in connection with the Sinochart Charterparty, Conch Logistics Charterparty, and/or the Supply Agreement.

3. Sinochart shall issue to PCAL a Receipt in the terms of the attached draft within 3 days following the safe and timely receipt of the Settlement Sum.

4. Upon receipt and in consideration of the payment of the Settlement Sum, each of Conch Logistics, Conch Building, PCAL and Sinochart shall waive all their respective rights against each other and release each other in respect of all and any claims, duties, liabilities and obligations arising out of or in connection with the Sinochart's Losses, Conch Building's losses (if any), Conch Logistic's losses (if any), the Sinochart Charterparty, the Conch Logistics Charterparty and/or the Supply Agreement, and all and any such claims, duties, liabilities and obligations between the Contracting Parties shall be absolutely and mutually discharged and released.

5. Should the Settlement Sum not be received by Sinochart within 3 banking days from the date of this Deed, this Deed of Settlement shall be deemed as null and void. And any rights and/or claims Sinochart may have against Conch Logistics are still reserved and not prejudiced.

If Sinochart can safely and duly receive the Settlement Sum within 3 banking days from the date of this Deed, the Parties shall not commence nor cause to be commenced or continue (if already commenced) any action or further action or proceedings of any nature in any jurisdiction in respect of the matters hereby settled under the charterparties and Supply Agreement.

6. It is a condition of PCAL's payment of the settlement sum that each of Conch Logistics, Conch Building and Sinochart agrees and undertakes to upon the first demand of PCAL and/or their lawyers and/or authorized representative provide all possible assistance to PCAL in respect of their claim against Cementval under the Sale Agreement and to do all such acts or things as may be required by PCAL and/or their lawyers and/or authorized representative in connection with the aforesaid claim against Cementval and whatever legal actions that would be commenced and perused against Cementval.

7. The Agreement is confidential and strictly private but PCAL is entitled to disclose this Deed and its contents when it deem fits and/or for the purposes of claiming against Cementval.

8. This Settlement Agreement is governed by and construed in accordance with the English Law. The parties submit to exclusive jurisdiction of the Courts of England and Wales in respect of dispute, differences, or claims arising out of or in connection with this Settlement Deed.

IN WITNESS whereof this Deed has been duly executed on the date first above written.

EXECUTED as a DEED by                          )
PROSPERITY CEMENT (ASIA) LIMITED               )
– MACAO COMMERCIAL OFFSHORE                    )
and signed by                                  )
in the presence of :                           )

2.08.4441.00.842299                            6

SEALED with the COMMON SEAL of

SHANGHAI CONCH BUILDING MATERIALS

INTERNATIONAL TRADE CO., LTD

in the presence of : 刘洋




EXECUTED as a DEED by .................... )

SHANGHAI CONCH LOGISTICS CO., LTD )

signed by                                    )

in the presence of : 唐道然                    )


SEALED with the COMMON SEAL of            )

CHINA NATIONAL CHARTERING CO., LTD       )

and signed by                             )

in the presence of :                      )

法人代表耿晨

2009/04/07

[To be printed on letterhead of China National Chartering Co., Ltd]

### RECEIPT

TO:   **PROSPERITY CEMENT (ASIA) LIMITED – MACAO COMMERCIAL OFFSHORE**
Rm A4, 2/F.,
AV. Praia Grande,
No 369.
Keng Ou Commercial Building,
Macau

Dear Sirs,

**Deed of Settlement dated 7 April 2009**

We hereby acknowledge receipt of the sum of US$2,160,000.00 which is paid by you in accordance with the terms of the above mentioned Deed of Settlement dated [    ] made between our respective companies, Shanghai Conch Building Materials International Trade Co., Ltd. and Shanghai Conch Logistics Co., Ltd.

Yours faithfully,

-------------------------------------
*[name of signatory]*, as Legal Representative (法定代表人)
of **China National Chartering Co., Ltd**
*(N.B Please sign and affix the official seal)*

Dated this      day of      2009

2.08.4441.00 842299                                8